|  |  |  |
|---|---|---|
| | : | |
| **UNITED STATES OF AMERICA,** | : | |
| | : | **No. 3:17-CR-00055-3 (VLB)** |
| v. | : | |
| | : | |
| **RANDY MARCHI,** | : | **March 21, 2018** |
| **Defendant.** | : | |
| | : | |
| | : | |

## MEMORANDUM OF DECISION ON MOTION TO SUPPRESS [DKT. 154]

### I.     Introduction

Before the Court is the Motion to Suppress, [Dkt. No. 154], filed by the
Defendant Randy Marchi. ("Defendant" or "Mr. Marchi").  Defendant seeks to
suppress evidence seized on February 26, 2017, during a warrantless search
("Search") of his Apartment located at 2559 Main Street, Third Floor, Bridgeport,
CT ("Apartment") where he lived with Guissel Gumbs ("Ms. Gumbs") and her 9-
year old son. The search was conducted by numerous law enforcement officers,
including members of the Federal Bureau of Investigation ("FBI"), Bridgeport
Safe Streets Task Force ("BSSTF"), Drug Enforcement Administration ("DEA")
and Bridgeport Police Department ("BPD") (collectively, "Agents").  Ms. Gumbs
signed an FBI Consent to Search Form on the day of the Search.  Defendant
contends that Ms. Gumbs did not voluntarily consent to the search and therefore
the fruits of the search should be suppressed.

During the search, the Agents found a firearm as a result of which
Defendant was indicted for possession of a firearm in furtherance of a drug

trafficking crime in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 924(c)(2); and conspiracy to possess with intent to distribute heroin in violation of 21 U.S.C. §§ 841 (a)(1), (b)(1)(A)(i), and 846. For the reasons that follow, the Court finds Ms. Gumbs did not invite the Agents to enter the Apartment or sign the Consent to Search Form voluntarily and accordingly GRANTS the motion to suppress any and all objects and materials seized during the Search, including but not limited to the firearm.

Defendant also seeks to suppress other materials, specifically any statements made, either as directly tainted or as fruit of the poisonous tree, and any yet unspecified materials, statements or other evidence subsequently obtained through the use of motions, applications or other petitions, upon which the materials or statements obtained as a product of the Search were based. As Defendant has offered no evidence relating to such other material and statements, the motion to suppress such other unspecified material and statements is DENIED without prejudice.

II.    <u>Facts</u>

The Court conducted a suppression hearing on February 9, 20, and 24 of 2018. At the hearing, the Government presented the testimony of DEA Agent Hoffman ("Agent Hoffman") and Bridgeport Police Officer and Task Force Member Pereira ("Officer Pereira"), and the Defendant presented the testimony of Ms. Gumbs. From the testimony adduced at the hearing, the Court finds the following facts proven by a preponderance of the evidence.

This case involves a drug conspiracy investigation, which began in 2015. Defendant was one of several targets of the investigation. Mr. Marchi had no criminal record. Although he had once been arrested for a firearms offense, he was never convicted, the charges were dismissed, and the record of his arrest had been expunged.

During the investigation, Officer Pereira conducted surveillance on Mr. Marchi and Ms. Gumbs both day and night. Officer Pereira observed them enter and exit 2559 Main Street, Bridgeport, CT on many occasions, including instances in which he could see lights being turned off and on, affording him an opportunity to determine in which apartment they lived. He also had opportunities to determine whether there were mailboxes and/or door bells marked with the names of the occupants and to speak to neighbors. Members of the investigation team knew where Ms. Gumbs worked and what she did for a living. Based on the foregoing, the Court finds that at least some members of the investigation team knew the apartment in which Mr. Marchi and Ms. Gumbs lived.

On February 26, 2017, a Task Force led by Agent Hoffman executed numerous search and seizure warrants of residences and motor vehicles, including a white Honda Accord, which Marchi regularly drove but was registered to the mother of co-defendant Ivan Rosario. The vehicle had been surveilled both physically and electronically using a GPS monitoring device. There was no evidence the surveillance yielded information that either Mr. Marchi or Ms. Gumbs was involved in drug trafficking. The warrants were executed in anticipation of seizing a large quantity of drugs but did not yield the expected results. Inside

Marchi's white Honda Accord, investigators recovered grinders used for processing heroin powder, thousands of heroin packaging packets, and nearly twenty stamps for branding street-level heroin.

Thereafter, at approximately 12:30 PM, the Agents decided to conduct a "knock and talk" and question Randy Marchi. Before the Agents arrived at the Apartment, Marchi noticed his vehicle was missing and went to find it, leaving Ms. Gumbs and her 9-year old son alone at the Apartment. Agent Hoffman testified that he knew a state Superior Court Judge for the Judicial District of Bridgeport was assigned to sign warrants on that Sunday. The Agents did not obtain a warrant for Mr. Marchi's arrest or a warrant to search the Apartment. In response to the Court's question, Agent Hoffman testified that the reason they did not obtain a warrant was that they wanted a federal warrant rather than a state warrant. Thereafter, in response to a leading question on redirect, Agent Hoffman confirmed that he did not know in which apartment Marchi lived and therefore could not have obtained a warrant.

The Agents approached the multi-family dwelling in which the Apartment was located from the front and rear simultaneously. When they were unable to gain entry through the back door, most of the Agents entered the unlocked common door to the enclosed front porch while the others surrounded the building. The Agents at the door knocked on the locked common front door, which led to a common vestibule from which the individual apartments were accessible ("Vestibule Door"). They knocked incessantly for several minutes. Ms.

Gumbs responded, wearing nothing but a sheer nightgown.[1]  Ms. Gumbs answered the locked Vestibule Door.  She stood in the vestibule responding cooperatively to the questions posed to her by Agent Hoffman while the other Agents looked on.

Unbeknownst to Ms. Gumbs, Agent Hoffman put his foot over the threshold of the Vestibule Door, preventing the door from closing and asked for Randy Marchi.  Ms. Gumbs responded that he was not home and explained that he noticed his vehicle was missing and had gone to find it.  Agent Hoffman asked if she could contact him.  Ms. Gumbs agreed to call him and said she would go get her telephone.  Although the door did not close behind her, there is no evidence that she was aware of it at the time she went upstairs or if she realized it later.

Only after Ms. Gumbs left the vestibule did the Agents enter the vestibule. Ms. Gumbs proceeded up the steps to the third floor and passed through the locked front entrance door to the Apartment and retrieved her telephone. Moments later, eight or so Agents followed Ms. Gumbs to the third floor, concerned that she was taking too long and that she might be informing Mr. Marchi of their presence.  As Ms. Gumbs opened the Apartment Door to return to the vestibule she was confronted by approximately eight Agents.  Agent Hoffman was at the last stair leading to the Apartment and the other Agents were behind

_____

[1] The Government introduced evidence that Ms. Gumbs is an exotic dancer.  The Court assumes this evidence was elicited to establish that she is accustomed to being seen scantily dressed by strange men.  The Court cannot infer that her supposed comfort with entertaining in a controlled environment while clothed in a skimpy costume means she was comfortable answering the door of her home or being in the supposed privacy of her home alone with her young son wearing only her nightgown with eight strange gun-wielding men who entered her home uninvited.

him in a line mounting the stairs. There was no landing separating the last stair on which Agent Hoffman stood and the threshold of the Apartment Door behind which Ms. Gumbs was standing as she opened the Apartment Door and encounter the Agents. The Apartment was a small space consisting of three rooms all of which were visible from the Apartment Door. The Agents entered the Apartment, without asking permission or receiving an invitation, with their firearms brandished in the ready-fire position forcing Ms. Gumbs to retreat.

Upon entry, the Agents instructed Ms. Gumbs to sit on her bed with her young child. She was still dressed only in her nightgown. She did as she was told. The Agents conducted a cursory protective security sweep during which Agent Hoffman attempted to question Ms. Gumbs. Agent Hoffman was unable to question Ms. Gumbs because she only speaks Spanish. She asked Agent Hoffman for "the paper," meaning a search warrant. Despite her clear indication that she wanted to see the Agent's legal authority to enter her home without her consent, the Agents told her they did not have one and asked her to sign the FBI Consent to Search Form. She declined, explaining that she did not understand everything that was being said to her.

From whatever she was told, she understood that if she did not sign the Consent to Search Form the Agents would get a warrant and search anyway, and that because the Agents smelled something illegal in the bedroom, the Department of Children and Families ("DCF") would be called and her son could be taken away and that United States Citizenship and Immigration Services ("USCIS") would be called and she could be deported. Fearing the loss of her

son and deportation, she asked if a Spanish-speaking officer could be called to translate. Even at this point, she persisted in her refusal to consent.

Portuguese-speaking Officer Pereira was summoned. He speaks some Spanish. He spoke to Ms. Gumbs and attempted to befriend her. He asked her repeatedly to sign the release and told her it would be best for her if she did. He was not present when she was told something that led her to fear that DCF and USCIS would be called, and he did not tell her DCF and USCIS would not be called if she persisted in refusing to consent to a search of the Apartment and to demand to see a warrant. He also never told her she has the legal right to refuse to consent to the search and persist in her earlier demand to see a warrant.

The Consent to Search Form states:

1. I have been asked by Special Agents of the Federal Bureau of Investigation to permit a complete search of: [the address is hand written]. 2. I have been advised of my right to refuse consent. 3. I give permission voluntarily. 4. I authorize the agents to take any items they determine may be related to the investigation.

[Mot. Suppress Gov. Ex. 3]. It is dated and signed by Ms. Gumbs. Officer Pereira signed attesting that he witnessed her signature.

Under Officer Pereira's signature is written, "Translated by TFO Ilidio Pereira," in what appears to be the same handwriting as the address. Officer Pereira denied translating it, intimating that he had not seen the handwritten statement that he did. He testified that Ms. Gumbs used a translation application on her phone to translate the form and that he overheard the translation and that the translation was accurate. The Court finds the Consent to Search Form was altered by a law enforcement officer involved in the Search sometime after it was

signed. The Court further finds that this alteration was prompted by the knowledge that Ms. Gumbs did not proficiently speak English and that, had the consent form not been translated, her consent could not have been voluntary. In addition, the Court finds that Ms. Gumbs was not advised of her right to persist in her refusal to consent to the Search as the form states. Finally, the Court finds Ms. Gumbs did not fully understand the consent form because she signed it falsely acknowledging something occurred that did not occur.

The Government introduced into evidence two photographs of Ms. Gumbs and her son sitting on the bed in the Apartment while the Agents were present. Ms. Gumbs is looking up at and listening to Officer Pereira as he stands over her speaking and gesturing in an authoritative manner. See [Gov. Ex. 8 at USAO 2907–08]. In both photographs, she is wearing a sheer nightgown. Her jaw is slack and her eyes are wide open in a classic "deer-in-the-headlights" pose. In the Court's view, she appears frightened and overwhelmed.

There is no evidence on the time that elapsed between Ms. Gumbs's first encounter with the Agents and the time she signed the Consent to Search Form, but the entire encounter lasted approximately one hour. The Search occurred and the Agents located the firearm, which is the subject of this motion. During the encounter, Ms. Gumbs also made statements to the Agents, none of which appear to be inculpatory.

### III. Legal Standard

The law governing warrantless searches and the admissibility of evidence seized during such searched is undisputed. The Fourth Amendment protects

"the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A defendant who files a motion to suppress articles seized and information obtained without a warrant bears the burden of showing his or her Fourth Amendment rights were violated. *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978).

The defendant must first prove that he had a legitimate expectation of privacy in the place searched and items seized. *See United States v. Osorio*, 949 F.2d 38, 40 (2d Cir. 1991). The defendant must then prove that the search was conducted without a warrant, as a law enforcement official must obtain a search warrant in order to search or seize an individual's property unless an exception applies. *See Maryland v. Dyson*, 527 U.S. 465, 466 (1999) (per curiam); *United States v. Jenkins*, 876 F.2d 1085, 1088 (2d Cir. 1989). Warrantless searches are presumptively unreasonable. *Kentucky v. King*, 563 U.S. 452, 459 (2011); *Katz v. United States*, 389 U.S. 347, 357 (1967). If the defendant succeeds in showing that the officers conducted a warrantless search, the burden shifts back to the Government to show that the search fell within one of the exceptions to the warrant requirement. *United States v. Kiyuyung*, 171 F.3d 78, 83 (2d Cir. 1999) (exceptions are "specifically established and well-delineated").

A defendant bears the initial burden of proof on a motion to suppress, but where the "defendant establishes some factual basis for the motion, the burden of proof shifts to the Government to show that the search was lawful." *United States v. Breckenridge*, 400 F. Supp. 2d 434, 437 (D. Conn. 2005); *United States v. O'Neill*, No. 15-CR-151W, 2016 WL 6802644, at *8 (W.D.N.Y. Nov. 17, 2016) (same).

Ultimately, the party carrying the burden must do so by a preponderance of the evidence. *O'Neill*, 2016 WL 6802644, at *8.

Here, the Government admits it chose not to obtain a warrant and does not contest Mr. Marchi's claim that he had an expectation of privacy in the Apartment or the items seized therefrom, and it admits it conducted a warrantless search. The Government relies on two exceptions to the warrant requirement: consent and exigent circumstances. The Court discusses these two exceptions below.

IV.   Analysis

A.   *Challenge to Affidavit*

As an initial matter, at the hearing it was disclosed that Ms. Gumbs's Affidavit filed by Defendant with his Motion to Suppress was prepared with the assistance of one of more Spanish interpreters. At the end of the first day of the suppression hearing, the Government objected on procedural grounds to the form of the Affidavit. It objected on four grounds: (1) the fact that the Affidavit was the product of a Spanish translation, (2) there was no contemporaneous Spanish version, (3) there was no attestation that the Affidavit was read to Ms. Gumbs, and (4) the translator did not sign the Affidavit. The Government argues that the Court need not conduct a hearing on a motion to suppress unless there is an affidavit raising a genuine issue of fact.

First, the Motion to Suppress was accompanied by an Affidavit which on its face raised a genuine issue of fact. Second, all of the defects in the affidavit were cured. The testimony offered at the hearing disclosed the fact that it was prepared with the assistance of translators. Specifically, Ms. Gumbs testified that

she telephonically dictated the Affidavit to Attorney Sullivan, counsel for the Defendant, over the telephone while being assisted by a Spanish translator. She also testified that she went to Attorney Sullivan's office to sign the Affidavit and a Spanish translator on a speaker-phone translated the Affidavit to her before she signed. Defense counsel later filed a certification from the translator who translated the affidavit on the day Ms. Gumbs signed it. Finally, Ms. Gumbs's testimony at the suppression hearing was substantially consistent with (although more detailed than) her Affidavit. The Affidavit asserts facts which, if true, establish that Ms. Gumbs did not voluntarily or intelligently sign the Consent to Search Form. Any technical defect in the affidavit has been cured.

## B. *Right to Be on Premises and Consent*

### 1. *The Agents Exceeded Their Right to be on Premises*

The Government states the Agents' intent was to secure the evidence and scene and to conduct a "knock and talk" with Mr. Marchi, during which they would confront him with the evidence against him in hopes he would concede his guilt and cooperate with the investigation. The "knock and talk" exception to the warrant requirement permits law enforcement officers to "encroach upon the curtilage of a home for the purpose of asking questions of the occupants." *United States v. Hammett*, 236 F.3d 1054, 1059 (9th Cir. 2001), *implied overruling on other grounds by United States v. Perea-Rey*, 680 F.3d 1179 (9th Cir. 2012); *see United States v. Allen*, 813 F.3d 76, 87 (2d Cir. 2016) (recognizing the "knock and talk" tactic); *United States v. Lucas*, 462 F. App'x 48, 50–51 (2d Cir. 2012) (same).

The relevant "consent" in a "knock and talk" case is implied from the custom of treating the "knocker on the front door" as an invitation (i.e., license) to approach the home and knock. *Florida v. Jardines*, 569 U.S. 1, 8 (2013) (citation omitted). The scope of the exception is coterminous with this implicit license. *Id.* Stated otherwise, to qualify for the exception, the government must demonstrate that the officers conformed to "the habits of the country." *Id.* (quoting *McKee v. Gratz*, 260 U.S. 127, 136 (1922)). In the typical case, if the police do not have a warrant they may "approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Id.* Notably, "[a]n officer does not violate the Fourth Amendment by approaching a home at a reasonable hour and knocking on the front door with the intent merely to ask the resident questions, even if the officer has probable cause to arrest the resident." *United States v. Lundin*, 817 F.3d 1151, 1160 (9th Cir. 2016). That is not what happened here. The Agents did not linger briefly. They knocked on the Vestibule Door incessantly for several minutes and continued knocking until Ms. Gumbs responded. Their incessant knocking prompted Ms. Gumbs to come downstairs in her nightgown to answer the door.

Here, the Agents came beyond the yard, through the first door that was unlocked onto the covered porch, and banged on the door repeatedly by their own admission for several minutes. They impressed upon Ms. Gumbs such a sense of urgency that she responded wearing only a sheer nightgown without taking the time to get dressed. Thereafter, they mounted the stairs uninvited and entered her apartment en masse, forcing Ms. Gumbs to retreat.

## 2. *The Agents Did Not Receive Consent to Enter the Apartment*

The Government may conduct a search without a warrant with the "voluntary consent of a person authorized to grant such consent." *United States v. Elliot*, 50 F.3d 180, 185 (2d Cir. 1995). In order for the consent exception to apply, the consent must be voluntary. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 248-49 (1973); *United States v. Buettner-Janusch*, 646 F.2d 759, 764 (2d Cir. 1981). In sum, the consent must not have been "a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority." *United States v. Wilson*, 11 F.3d 346, 351 (2d Cir. 1993); *see also United States v. Vasquez*, 638 F.2d 507, 524 (2d Cir. 1980). The inquiry under the Fourth Amendment is one of objective reasonableness, the standard for measuring consent is not the occupant's intent but rather whether a "typical reasonable person [would] have understood by the exchange between the officer and the [occupant]" that consent was given. *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). Further, police officers need not always be correct under the Fourth Amendment, they only need to be reasonable. *Id.* at 250–51.

"The Second Circuit has consistently held that consent need not be express but may be implied from an individual's words, acts or conduct." *Seifert v. Rivera*, 933 F. Supp. 2d 307, 316 (D. Conn. 2013) (internal quotation marks and citations omitted). "Thus a search may be lawful even if the person giving consent does not recite the talismanic phrase: 'You have my permission to search.'" *United States v. Grant*, 375 F. App'x 79, 80 (2d Cir. 2010) (holding that the defendant had consented when he allowed the police officers into his

apartment building and allowed the officers to follow him into his apartment "without impediment or objection to the entry of the police"). As such, a consented-to search is not unreasonable so long as the "police do not coerce consent." *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995).

Ultimately, it is the Government's responsibility to prove by a preponderance of the evidence that the consent was voluntarily given and not the consequence of force or coercion. *See United States v. Isiofia*, 370 F.3d 226, 230 (2d Cir. 2004) ("The government has the burden of proving, by a preponderance of the evidence, that a consent to search was voluntary."); *Buettner-Janusch*, 646 F.2d at 764. In determining whether consent was given voluntarily—as opposed to in acquiescence to a show of authority overcoming the consenter's will—the Court must consider the totality of the circumstances. *Wilson*, 11 F.3d at 351; *see also United States v. Bye*, 919 F.2d 6, 9 (2d Cir. 1990). A number of factors are relevant to determining whether consent was given voluntarily. These include the consenter's age, education, background, physical and mental condition, and the setting in which the consent is obtained. *See Schneckloth*, 412 U.S. at 226.

The Agents' incessant knocking on the Vestibule Door for several minutes compelled Ms. Gumbs to answer the door. The urgent and commanding nature of their importuning is evidenced by the fact that she left the privacy of her home and went downstairs to the common area without taking the time to get dressed. At that time, she had reason to believe thieves were afoot as Mr. Marchi's vehicle was missing.

The Agents became impatient and then rushed upstairs to the third floor Apartment Door, physically confronting Ms. Gumbs as she opened the Apartment Door in an attempt to return as promised to call Mr. Marchi. The configuration of the entrance to the Apartment lacked a landing and forced her to retreat into the Apartment as the Agents rushed into the Apartment without permission. Once inside, they instructed Ms. Gumbs to remain sitting on the bed with her son and she complied.

The Government contends the Agents had an invitation to cross the threshold of the Vestibule Door, enter the vestibule, mount the stairs, and enter the Apartment. The Government argues that Ms. Gumbs's retreat from the open doorway was construed by the Agents as an implied invitation to enter the vestibule. In support, the Government cited this Court's ruling in *Seifert*, 933 F. Supp. 2d at 315–18, which held on a motion for summary judgment that the detectives reasonably believed they were invited into the dwelling when the occupant opened the door, retreated from the door, closed the door behind them, and invited them to sit in the living room. Reliance on *Seifert* is misplaced for several reasons.

First, the facts are vastly divergent. In that case, law enforcement officers knocked on the door of the dwelling and the person who answered the door stepped backwards without speaking. Here, Ms. Gumbs opened the Vestibule Door and Agent Hoffman surreptitiously put his foot over the threshold, blocking Ms. Gumbs from closing the door without her having stepped back or otherwise doing anything that the Government can identify as a basis for the Agents to

believe she had extended an invitation for the Agents to enter. Ms. Gumbs testified that she noticed that the Vestibule Door did not fully close, but she did not testify when she came to that realization. Even if she did notice it at the time, her acquiescence to this nominal forcible intrusion cannot be perceived as an invitation to enter.

Second, as Ms. Gumbs retreated from the Vestibule Door, she stated she was going to get her telephone and return to call Mr. Marchi. In so stating, it is clear that she intended the Agents to remain in the common area on the porch and that she had not invited them to enter. These facts are similar to *Felmine v. City of New York*, No. 09–CV–3768 CBA JO, 2011 WL 4543268, at *16 (E.D.N.Y. Sept. 29, 2011), in which the occupant indicated she would check to see if her son was in the home, "turned [her] back, let go of [the] door, walked into the room," and the officers thereafter followed. In both circumstances, the occupants verbally indicated they were going inside to retrieve something or someone, and let the door close behind them. This case is distinguishable from cases in which the occupant was silent and behaved in a way that could conceivably be construed as an invitation, which was the case in *Seifert*. For example, where a defendant advised the officers that his identification was inside the house and entered for the purpose of showing them his identification, the Court held he may have given the impression that the officers could follow. *See United States v. Deutsch*, 987 F.2d 878, 883 (2d Cir. 1993).

The Government's own witness testified that the Agents did not follow Ms. Gumbs into the vestibule, up the stairs, and into the apartment as she retreated.

They remained on the first floor waiting for her to return until they feared she was undermining their investigation when she did not return quickly enough. The fact that they remained on the porch and in the vestibule confirms their understanding that she had not authorized them to enter. Having no reasonable belief that they had been invited to breach the threshold of the Vestibule Door or to enter the vestibule, the Agents certainly did not have a reasonable belief that they had been invited to mount the stairs.

At the top of the stairs was the door to the Apartment, which had no landing. As Ms. Gumbs opened or was attempting to exit through the Apartment Door, she was confronted by Agent Hoffman and seven officers rushing up the steps behind him. Ms. Gumbs had no choice but to retreat when confronted unexpectedly by such a show of force.

### 3. *The Agents Did Not Receive Voluntary or Knowing Consent to Search the Apartment*

Once inside the Apartment, the Agents brandished their firearms and forced Ms. Gumbs to sit on her bed in her nightgown with her young child while they searched her Apartment. As and after the security sweep was conducted, Agent Hoffman asked Ms. Gumbs to consent to the search by signing the Consent to Search Form. He also told her that a warrant would be obtained if she did not consent. An officer's statement that a search warrant can be obtained if consent is withheld is not sufficiently coercive to render consent involuntary. *See United States v. Calvente*, 722 F.2d 1019, 1023 (2d Cir. 1983). Nor is consent involuntary where police tell a person that they will remain in the apartment until

they obtain a search warrant. See *United States v. Yu-Leung*, 51 F.3d 1116, 1119 (2d Cir. 1995).

Agent Hoffman spoke to Ms. Gumbs in English, which she did not fully understand; she told him she did not understand English, refused to sign the consent form, and asked for "the paper" (meaning the warrant). For whatever reason, she understood the Agents to say that they smelled something illegal in the Apartment and as a consequence she would be deported and her son would be taken into DCF custody.

Afterward, they summoned Officer Pereira who speaks Portuguese fluently and Spanish conversationally. Officer Pereira testified that although he spoke to Ms. Gumbs in Spanish, he did not advise her of her right to refuse consent or tell her that DCF and USCIS would not be called if she refused. On the contrary, he advised her that it was in her interest to sign it and give consent. It would have been reasonable for her to construe his advice as a quid pro quo, meaning no harm will come to you or your son if you sign. No evidence was introduced to establish an alternative reason why she would have voluntarily consented after refusing and insisting on a warrant. In light of her understanding before he arrived, this advice could have reinforced her impression that she and her son would be in jeopardy if she did not consent.

In addition to his failure to advise her, he did not translate the Consent to Search Form to her. He testified that she translated it herself using a translation application on her telephone. This testimony was directly contrary to the testimony of Agent Hoffman who testified that Officer Pereira translated and

explained the form to her. Moreover, the Consent to Search Form falsely states he translated it to her. This false statement is printed below the signatures of Ms. Gumbs and Officer Pereira who signed as a witness. The improper alteration of the signed Consent to Search Form is further evidence that Ms. Gumbs did not understand what she was signing, the Agents knew she did not understand it, and that she did not sign it voluntarily and knowingly.

The Government also introduced into evidence two photographs tending to show Ms. Gumbs was afraid and overwhelmed. They depict Officer Pereira standing over Ms. Gumbs speaking authoritatively and gesturing with his hand as she sits in her nightgown with her son on her bed wearing an expression of utter bewilderment and supplication. [Gov. Ex. 8, USAO 2907–08].

Under the totality of the circumstances, the preponderance of the evidence establishes that Ms. Gumbs did not sign the Consent to Search Form voluntarily. While the credibility of certain portions of her testimony is questionable, the Court finds the circumstances of the search otherwise corroborates her testimony that she felt compelled to sign the Consent to Search Form. Her unfamiliarity with police encounters, the number and overbearing behavior of the Agents, her state of undress, her lack of English proficiency, the presence of her young son, her pregnancy, her concern that she would be deported and her child taken into state custody, and her bewildered and supplicant expression combine to establish that her will to persist in her refusal to sign the Consent to Search Form was overcome by the pressure imposed upon her by the Agents, rendering her consent involuntary. *See, e.g., Isiofia*, 370 F.3d at 232 (consent involuntary

where defendant had been handcuffed to table for more than half hour, was not native English speaker, and consent given shortly after eight agents converged on apartment); *United States v. Vasquez*, 638 F.2d at 526–27 (no consent to enter defendant's apartment where police told defendant he was being taken there because they were going to arrest his wife); *United States v. Sanchez*, 635 F.2d 47, 61 (2d Cir. 1980) (remanding where trial court failed to determine whether Sanchez "merely submitted" to officers' authority "believing the officers were going to enter regardless of what he said"). What is more, the fact that the Agents remained in the vestibule initially and the alteration of the consent to Search Form corroborate the conclusion that the Agents entered without consent and exacted Ms. Gumbs's signature knowing that she did so involuntarily under duress and without an understanding of her rights.

### C. *Exigent Circumstances*

The second exception to the warrant requirement applicable here is the exigent circumstances exception. Turning to the Government's claim that the search of the Apartment was undertaken under exigent circumstances, the Government asserts that the circumstances were exigent because the execution of search warrants earlier that day—including the one which resulted in the seizure of Mr. Marchi's Honda Accord—would alert the suspected drug dealers that law enforcement was aware of their illegal activity prompting them to flee, secret or destroy evidence, and alert others to do the same. They also contend that they suspected Ms. Gumbs was alerting Mr. Marchi of their presence and that he would in turn inform co-conspirators.

The Government correctly cites the non-exhaustive factors courts in this circuit consider in determining whether exigent circumstances exist to allow a warrantless search or seizure:

> (1) the gravity or violent nature of the offense the suspect allegedly committed; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause that the suspect committed the crime; (4) strong reason to believe the suspect is in the premises being entered; (5) a likelihood the suspect will escape if not swiftly captured; and (6) the peaceful circumstances of the entry.

[Dkt. 193 (Opp'n) at 17 (citing *MacDonald*, 916 F.2d 766, 769–70 (2d Cir. 1990) (internal quotation marks removed))].

The exigency must be so compelling that the warrantless search is objectively reasonable under the Fourth Amendment. *See McDonald v. United States*, 335 U.S. 451, 454 (1948); *Johnson v. United States*, 333 U.S. 10, 14–15 (1948); *see also Warden v. Hayden*, 387 U.S. 294, 298–300, 310-11 (1967) ("hot pursuit" of fleeing suspect). In addition, "a reasonable belief by law enforcement officials that the targets of an investigation are armed or that quick action is necessary to prevent the destruction of evidence can serve to show exigent circumstances." *Abdella v. O'Toole*, 343 F. Supp. 2d 129, 139 (D. Conn. 2004) (quoting *MacDonald*, 916 F.2d at 770). Courts have permitted warrantless home arrests for major felonies if identifiable exigencies, independent of the gravity of the offense, existed at the time of the arrest where law enforcement officers have strong evidence that the persons arrested without a warrant had committed a violent crime, that they were in the place entered without a warrant, and that they were engaged in ongoing criminal activity. *United States v. Campbell*, 581 F.2d 22, 26 (2d Cir. 1978); *State v. Guertin*, 190 Conn. 440, 453 (1983). Exigent

circumstances exist where law enforcement officers have reason to believe "that an offense is taking place in their presence," "that the suspect is at that moment in possession of the evidence," and "[d]elay could cause the escape of the suspect or the destruction of the evidence." *United States v. Watson*, 423 U.S. 411, 435 (1976).

The district court found exigent circumstances where an assisting officer arrived on the scene and observed an individual shove another officer and flee into a building. *See Hogan v. Caputo*, No. 02-CV-1040(LEK/RFT), 2004 WL 1376395, (N.D.N.Y. June 21, 2004). The district court also found exigent circumstances where officers approached an individual who fled into a suspected stash house when officers approached him in a public place and asked him a question. *United States v. Martinez-Gonzalez*, 686 F.2d 93 (2d Cir 1981); *c.f. Breitbard v. Mitchell*, 390 F. Supp. 2d 237, 248 (E.D.N.Y. 2005) ("The Second Circuit has generally found *Santana's* reasoning inapplicable when the arrestee attempts to stay within his or her home.") (citing *Loria v. Gorman*, 306 F.3d 1271, 1286 (2d Cir. 2002) and *United States v. Reed*, 572 F.2d 412, 423 (2d Cir. 1978)).

Ms. Gumbs was not the suspect and the Agents had no reason to believe she was committing a crime. Even if the Agents believed Ms. Gumbs was calling Mr. Marchi to alert them to the Agent's presence, it is far from clear that this conduct would constitute an exigent circumstance. The Agents did not obtain a warrant for Mr. Marchi's arrest, although they had him and the vehicle he drove and for which they did obtain a warrant, under surveillance.

Agent Hoffman testified that their intent was to speak to rather than arrest him. Thus, it is unclear what if any crime Ms. Gumbs would have committed had she informed Mr. Marchi that the police were there asking for him.  An officer's failure to obtain a warrant where the individual has committed a minor offense and there are no exigent circumstances "displays a shocking lack of all sense of proportion."  *Welsh v. Wisconsin*, 466 U.S. 740, 751 (1984) (quoting *McDonald*, 335 U.S. at 459); *see Loria*, 306 F.3d at 1285–86 ("Although the existence of probable cause and knowledge that the suspect is on the premises are important predicates to a finding that an entry was justified based on exigent circumstances, they are not sufficient to justify entry where the crime involved is minor and there is no apparent potential for violence.").

Aside from the fact that Mr. Marchi lived in the Apartment, the Agents had no basis to harbor a strong suspicion that Mr. Marchi was in the Apartment.  Ms. Gumbs told them that Mr. Marchi noticed his vehicle was missing and had gone to find it.  Her statement of his whereabouts was consistent with the Agents' knowledge that the vehicle had been seized by law enforcement officers as part of their investigation.  There is no evidence on the record tending to show that Mr. Marchi was in the Apartment or that he had the drugs they sought.  The Apartment had been under surveillance and there was no evidence of drug activity at the Apartment.  Finally, there was no evidence that Mr. Marchi was aware of the seizure of his vehicle.

The Government offered scant evidence that Mr. Marchi was engaged in criminal activity other than the fact that the search of the vehicle he drove, which

belonged to someone else, yielded a large amount of drug paraphernalia. Mr. Marchi had no criminal record, both he and Ms. Gumbs had been under surveillance, and yet still there was no evidence introduced that either engaged in any drug activity or that any drug activity was suspected to have taken place at the Apartment. Nor did they have any basis to believe he was armed. There was no evidence that the Agents' investigation yielded evidence that he possessed a firearm. He had been charged with the possession of a firearm, but not only had he not been convicted, the charges were dismissed and the record was expunged.

There was no evidence of rapidly evolving events or the presence of anyone else involved in the suspected drug conspiracy. Even assuming the initial entry and protective security sweep were permissible under the Fourth Amendment, at that point the Agents knew the Apartment was occupied only by a bewildered mother and her small child. The fact that most of the Agents left is indicative of the benign nature of the circumstances. There were sufficient officers to surround the building, secure any contents and apprehend anyone coming or going while a warrant was sought on the basis of probable cause established by the contents of the white Honda Accord driven by Mr. Marchi. The Apartment was by the Agents' definition very small and they could see virtually all of it standing in the Apartment doorway. Moreover, there is no evidence that anyone was in imminent harm either.

Finally, to the extent there was an exigent circumstance, it was of the Agents' making. A law enforcement officer cannot create exigent circumstances

through unlawful conduct.  *See MacDonald*, 916 F.2d at 772 ("Therefore, we hold that when law enforcement agents act in an entirely lawful manner, they do not impermissibly create exigent circumstances. Law enforcement agents are required to be innocent but not naive."); *King*, 563 U.S. at 470 ("Any warrantless entry based on exigent circumstances must, of course, be supported by a genuine exigency."); *United States v. Sanchez*, 719 F. Supp. 128, 135 (E.D.N.Y. 1989) ("The Second Circuit Court of Appeals has made it clear that, where an exigency is agent-created, the agents cannot subsequently justify a warrantless entry by crying 'exigent circumstances'. . . . .").  The Agents did not approach the residence in a peaceful manner consistent with a "knock and talk."  They arrived at the residence in large number surrounded the house, approached from the front and the back simultaneously and when unable to enter through the back door, knocked incessantly demanding entry through the front door until Ms. Gumbs responded.  Their conduct was alarming and more consistent with officers arriving to execute a warrant, which the Agents chose not to obtain.  To the extent Ms. Gumbs was alarmed such that she posed a risk to the investigation, it was because of the aggressive conduct of the Agents.  The Agents cannot create an exigent circumstance to overcome their tactical decision not to or their inability to obtain a warrant for the arrest of Mr. Marchi or a search of his home.

## V.  Conclusion

The Court finds that neither consent nor exigent circumstances existed permitting a lawful entry or search of the Apartment.  Accordingly, the evidence seized at the Apartment is ORDERED suppressed.


IT IS SO ORDERED

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge


Dated at Hartford, Connecticut: March 21, 2018